**No. 14-55980**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

BRADLEY VAN PATTEN
*Plaintiff-Appellant,*

v.

VERTICAL FITNESS GROUP, LLC, and ADVECOR INC.,
*Defendants-Appellees.*

_____

Appeal from Order of the United States District Court
For the Southern District of California, No. 3:12-01614-LAB-MDD

_____

**PLAINTIFF-APPELLANT BRADLEY VAN PATTEN'S
OPENING BRIEF**

_____

LAW OFFICES OF GEORGE
RIKOS
George Rikos (SBN 204864)
225 Broadway, Suite 2100
San Diego, California 92101
Telephone:   (619) 525-2588

NICHOLAS & TOMASEVIC, LLP
Craig M. Nicholas (SBN 178444)
Alex M. Tomasevic (SBN 245598)
225 Broadway, 19th Floor
San Diego, California 92101
Telephone:  (619) 325-0492

*Class Counsel and Attorneys for Plaintiff-Appellant Bradley Van Patten*

## <u>STATEMENT OF RELATED CASES</u>

Plaintiff-Appellant is unaware of any related cases.

Dated: October 26, 2014        <u>*s/ Alex Tomasevic*</u>

NICHOLAS & TOMASEVIC, LLP

Class Counsel and Attorney for
Plaintiff-Appellant

Dated: October 26, 2014        <u>*s/ George Rikos*</u>

THE LAW OFFICES OF
GEORGE RIKOS

Class Counsel and Attorney for
Plaintiff-Appellant

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT .......................................... 5

QUESTIONS PRESENTED ................................................. 6

STANDARD OF REVIEW .................................................. 7

STATEMENT OF THE CASE .............................................. 8

    I.   Defendants Pluck Phone Numbers from Cancelled Gold's Gym Membership Agreements and then Blast Unsolicited Text Message Advertisements in a broad Marketing Campaign. .............. 8

    II.  Mr. Van Patten Files a Class Action Lawsuit Against Defendants .. 12

    III. The District Court's Ruling ............................................. 14

    IV. Pertinent Developments Following the District Court's Ruling ....... 15

SUMMARY OF ARGUMENT .............................................. 16

ARGUMENT .................................................................. 18

    I.  The District Court Erred in Ruling that Mr. Van Patten Provided "Prior Express Consent" in Accordance with the TCPA Just By Providing His Phone Number, Years Ago, to Gold's Gym for Association with his Short-lived Gym Membership. ........................ 18

        A.    We Do Not Need to Look Any Further than the Plain Language of the TCPA, which Shows that Mr. Van Patten Did Not Provide Prior Express Consent. ............................... 20

        B.    The District Court's Interpretation of Particular FCC Orders Was Flawed. Contrary to the District Court's Opinion, these FCC Orders Do Not Cut Against the Class... 26

i

# **TABLE OF CONTENTS** - CONTINUED

C.     Recent FCC Rulings Further Support the Consumer View as Opposed to the broad Spammer View regarding "Prior Express Consent' and, thus, that the District Court's Interpretation of the FCC Orders was Incorrect. ................... 32

D.     The District Court's Reliance on *Pinkard, Emanuel, Roberts, Murphy, Baird, Steinhoff and Andersen* are Misplaced and, in any Event, those Cases are Distinguishable. ..................... 38

E.     Even if Mr. Van Patten Gave Defendants "Prior Express Consent," Which He Did Not, the Consent Was Given to Gold's Gym and Was Also Revoked Upon Mr. Van Patten's Cancellation of His Gym Membership. ................... 45

II. The District Court also Erred in Ruling that There Was No Material Issue Regarding Whether Vertical Fitness "Conducts Business" in California ..................................................... 51

III. The District Court Erred in Finding that Mr. Van Patten's UCL Cause of Action Fails. ...................................................... 53

CONCLUSION AND SUMMARY OF REQUESTED RELIEF ............... 56

# TABLE OF AUTHORITIES

**Cases**

*Andersen v. Harris & Harris*,
  2014 WL 1600575 (E.D. Wisc. Apr. 21, 2014) ................................ passim

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................... 8, 52

*Baird v. Sabre Inc.*,
  2014 WL 320205 (C.D. Cal. Jan. 28, 2014) .......................... 17, 38, 43, 44

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
  467 U.S. 837 (1984) ..................................................................... 22

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ...................................................... 7

*Connelly v. Hilton Grant Vacations Co., LLC*,
  12-CV-599-JLS (KSC), 2012 WL 2129364 (S.D. Cal. June 11, 2012) .. 20,
  21, 42

*Emanuel v. Los Angeles Lakers, Inc.*,
  12-CV-9936-GW(SHx), 2013 WL 1719035
  (C.D. Cal. Apr. 18, 2013) ..................................................... passim

*Gager v. Dell Fin. Servs., LLC,*
  727 F.3d 265 (3d. Cir. 2013) ............................................... 30, 49

*Gardner v. Brown*,
  5 F.3d 1456 (Fed. Cir. 1992) ....................................................... 22

*Grant v. Capital Mgmt. Servs., L.P.*,
  449 F.App'x 598, (9th Cir. 2011) ............................................... 18

*Ibey v. Taco Bell Corp.*,
  12-CV-0583-H (WVG), 2012 WL 2401972 (S.D. Cal. June 18, 2012) ... 24

*In re Group Me/Skype Communications S.A.R.L. Petition for Expedited
  Declaratory Ruling*, FCC Rcd. 14-33,
  2014 WL 126074 (Mar. 27, 2014) ............................................ 32

*In re Jiffy Lube Intern., Inc., Text Spam Litig.*,
  847 F.Supp.2d 1253 (S.D. Cal. 2012) ....................................... 21

## <u>TABLE OF AUTHORITIES</u> - Continued

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
7 F.C.C.R. 8752 (Oct. 16, 1992) ....................................................... passim

*Kasky v. Nike, Inc.*,
27 Cal.4th 939 (2002)................................................................................ 54

*Kolinek v. Walgreens Co.*,
13-CV-4806 2014, WL 3056813 (N.D. Ill. July 7, 2014)............. 16, 36, 37

*Kwikset Corp. v. Sup. Ct.*,
52 Cal.4th 310 (2011)................................................................................ 54

*LaLonde v. Cnty. of Riverside*,
204 F.3d 947 (9th Cir. 2000)................................................................ 8, 52

*Letter to Ms. Catherine O'Hagan Wolfe*,
No. 13-1362, 2014 WL 2959062 (F.C.C. June 30, 2014)............. 16, 33, 35

*Lusskin v. Seminole Comedy, Inc.*,
12-CV-62173, 2013 WL 3147339 (S.D. Fla. 2013) ........................... 20, 21

*Murphy v. DCI Biologicals Orlando, LLC*,
2013 WL 6865772 (M.D. Fla. Dec. 31, 2013)............................... 17, 38, 43

*Nigro v. Mercantile Adjustment Bureau, LLC*,
2012 WL 951497 (W.D.N.Y. March 12, 2013)....................................... 35

*People v. E.W.A.P., Inc.*,
106 Cal.App.3d 315 (1980)....................................................................... 53

*Pinkard v. Wal-Mart Stores, Inc.*,
3:12-CV-002902-CLS, 2012 WL 5511039 (N.D. Ala. Nov. 9, 2012)
.................................................................................................... passim

*Roberts v. PayPal, Inc.*,
13-16304 (9th Cir.)............................................................... 17, 38, 41, 42

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009)............................................................ passim

*Smith v. Microsoft Corp.*,
11–CV–1958 JLS–BGS, 2012 WL 2975712 (S.D. Cal. July 20, 2012)... 55

*Steinhoff v. Star Media Co., LLC*,
2014 WL 1207804 (D. Minn. Mar, 24, 2014)................................... passim

## <u>TABLE OF AUTHORITIES</u> - Continued

*Stoot v. City of Everett*,
  582 F.3d 910 (9th Cir. 2009) ......................................................... 8

*Thrasher-Lyon v. CCS Commercial, LLC*,
  11-CV-04473, 2012 WL 5389722 (N.D. Ill. Nov. 2, 2012) ................... 21

*U.S. v. Ron Pair Enters., Inc.*,
  489 U.S. 235, 241 (1989) ......................................................... 20


**Statutes**

28 U.S.C. § 1291 ......................................................................... 6
28 U.S.C. § 1331 ......................................................................... 5
28 U.S.C. § 1367 ......................................................................... 5
47 U.S.C. § 227(a) ................................................................. 20, 23
Business & Professions Code section 17538.41 .................................. passim
Cal. Rev. & Tax Code § 23101 ..................................................... 53


**Other Authorities**

BALLENTINE'S LAW DICTIONARY 441, "EXPRESS" (3d ed. 1969) ............. 21
BARRON'S LAW DICTIONARY 176, "EXPRESS" (3d ed. 1991) .................... 21
BLACK'S LAW DICTIONARY 323 (8th ed. 2004) ................................... 21
H.R. REP. NO. 102-317, at 17 (1991). ............................................. 27

**Rules**

Fed. R. Civ. P. 56 ..................................................................... 8

**INTRODUCTION**

Defendants-Appellees Vertical Fitness Group, LLC ("Vertical Fitness"), a promoter of several private gyms, and Advecor, Inc. ("Advecor"), a marketing company (collectively "Defendants"), improperly blasted tens-of-thousands of text message advertisements to unsuspecting consumers like Plaintiff-Appellant Bradley Van Patten ("Mr. Van Patten") in violation of the Telephone Consumer Protection Act ("TCPA"), the California Business and Professions Code, and California's Unfair Competition Law ("UCL").

Mr. Van Patten, on behalf of himself and a certified class of about 80,000 people, and both Defendants, filed cross-motions for summary judgment and the District Court found in favor of each of the Defendants, granting their motions and denying Mr. Van Patten's. ER 2 (Order). The key issue was Defendants' defense of "prior express consent" under the TCPA— namely whether Mr. Van Patten provided "prior express consent" to Vertical Fitness and Advecor to take his phone number off of an old "Gold's Gym" application that they had access to from their earlier days of promoting for Gold's Gyms, that Mr. Van Patten cancelled more than three years prior, and to send text advertisements to Mr. Van Patten urging him to join a different gym (a different gym concept and gym location) that Vertical Fitness was

1

now promoting. The District Court held that simply by providing his phone number on the old Gold's Gym application three years prior, Mr. Van Patten had given Vertical Fitness and Advecor his "prior express consent" to receive auto-dialed text ads for new gyms, and that there was no material dispute to be found.

The Honorable District Court erred because, first, the plain language of the TCPA makes clear that the requisite consent must be "express." In the Ninth Circuit, "express consent" means "[c]onsent that is clearly and unmistakably stated." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009). Mr. Van Patten, by giving his phone number to a different gym in connection with a short-lived membership, did not provide clear and unmistakable consent to be sent auto-dialed text ads selling a different gym membership years later. The District Court erred by misinterpreting the statutory text itself. At a minimum, there is a material dispute as to whether Defendants adequately proved the "express consent" defense in this case.

The Honorable District Court also misinterpreted various FCC Orders that speak to the "express consent" issue under various circumstances. For example, while a 1992 FCC order does say that "persons who knowingly release their phone numbers have in effect given their invitation or

permission to be called at the number which they had given, absent instructions to the contrary," *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 (Oct. 16, 1992) ("1992 Order"), that rule is limited to subsequent "normal" or "expected" "business communications," like when a retailer tells its customer that his special order has arrived. The 1992 Order does *not* mean that the mere provision of a phone number *automatically* establishes "prior express consent" to be contacted for whatever reason, by any marginally related party, at any time until the end of all time. But that is what the District Court held. The cases that the District Court relied on and cited in arriving at that conclusion, moreover, are readily distinguishable and the Court's reliance on them compounded the error.

In the alternative, even if merely providing a phone number in connection with a Gold's Gym application over three years prior could be "prior express consent," the District Court still erred because any purported consent was *not* given to Defendants (it was given to the gyms) and was also subsequently revoked by Mr. Van Patten and the class members.

Fundamentally, the District Court erred by adopting an "automatic consent" standard—as in the class members *automatically* consented to text ads, by a different gym, off into infinity, simply by supplying a contact

3

number with their old Gold's Gym memberships. Recent rulings by the FCC —some of which have come down *after* the District Court ruling—highlight the error.

Separately, the District Court erred in finding that there was no material dispute about whether Vertical Fitness "conduct[s] business" in California under California Business and Professions Code section 17538.41. Appellant Van Patten presented significant evidence that Defendants do business in California. For example, Advecor is based in California and Vertical Fitness knowingly called California consumers. But the Honorable District Court improperly weighed and discounted that evidence on its way to snuffing out the claims. In short, the District Court erred in not finding, at a minimum, genuine issues of material fact as to whether Defendants conduct business in California and, therefore, whether they are subject to the protections afforded to consumers under section 17538.41.

Finally, the District Court made similar errors when holding that the UCL claim fails. First, the UCL claim is somewhat dependent on the other claims described above. So, for the same reasons, the District Court's adjudication of the UCL claim must also be overturned. Also, the District Court erroneously concluded that the text blasts did not create an "injury in

fact" sufficient to confer standing under the UCL. But Mr. Van Patten and the class members did indeed suffer such injury and showed that they paid for the texts through a text messaging plan. Mr. Van Patten also introduced expert testimony that showed how rampant spam text blasting of this kind increased the price of texts across the board. The District Court improperly discounted this evidence. Actually, it did not even mention it.

Based on the foregoing, this Court should overturn the District Court's ruling granting Defendants' motions for summary judgment and remand this case for further proceedings.

## JURISDICTIONAL STATEMENT

This appeal is taken from the District Court's May 20, 2014 order denying Mr. Van Patten's motion for summary judgment and granting each of Defendants' two motions for summary judgment, entering judgment in Defendants' favor under Federal Rules of Civil Procedure 56. ER 2 (Order). A clerk's judgment in accordance with that order was entered the same day. ER 3 (Clerk's Judgment).

This case includes a Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), cause of action. The District Court had jurisdiction under 28 U.S.C. § 1331, and to the extent the state law claims are involved, under 28 U.S.C. § 1367.

Mr. Van Patten filed a timely notice of appeal on June 18, 2014 in accordance with Federal Rules of Appellate Procedure 3 and 4 and Ninth Circuit Rules 3-1, 3-2, and 3-4. ER 1 (Notice of Appeal).

This Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1.  Did the District Court err in ruling that there was no genuine issue regarding whether Mr. Van Patten provided "prior express consent" within the meaning of the TCPA, when it was undisputed that he only provided a phone number in connection with signing up for a different gym membership, three years prior, without any explanation that the phone number might be used for bulk text marketing purposes?

2.  Did the District Court err in ruling that there was no genuine issue regarding whether Vertical Fitness conducts business in California (as contemplated by section 17538.41 of the California Business and Professions Code) when it was undisputed that Vertical Fitness marketed its gym to Mr. Van Patten, a California resident; and sent hundreds of text message advertisements to 175 individuals with California addresses and/or California phone numbers; provided access to their

products and services in California; engaged and contracted with, repeatedly, a California corporation based in San Diego (Advecor) to send the very text message advertisements at issue; and made statements that it plans to own and operate health clubs on a national basis, including California?

3.    Did the District Court err in ruling that there was no genuine issue regarding Mr. Van Patten's UCL claims, including that he indisputably suffered no "injury in fact" when, in fact, it was undisputed that he was charged for the text messages sent by Defendants, at a minimum, as part of a text-messaging plan, and when unchallenged expert testimony showed that rampant spam texting increases the price of everyone's texting plans?

## STANDARD OF REVIEW

This Court reviews a District Court's grant of summary judgment *de novo*. *Satterfield,* 569 F.3d at 950. Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, this Court must determine whether the District Court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

"Summary judgment is appropriate only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). Summary judgment is improper "[i]f conflicting inference may be drawn from the facts." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). Making credibility determinations or weighing conflicting evidence in not permitted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## STATEMENT OF THE CASE

**I. Defendants Pluck Phone Numbers from Cancelled Gold's Gym Membership Agreements and then Blast Unsolicited Text Message Advertisements in a broad Marketing Campaign.**

On or around March 21, 2009, Mr. Van Patten partially filled out a membership agreement with a "Gold's Gym" in Wisconsin. ER 12 (Van Patten Depo. at 121:17-126:19). Mr. Van Patten met with a manager, Amy Berggren, to discuss gym membership, at which time the manager filled out a Gold's Gym Membership Agreement on behalf of Mr. Van Patten, which Mr. Van Patten eventually signed. ER 12 (Van Patten Depo. at 121:17-126:19); ER 8 (Berggren Depo. at 42:16-43:15); ER 4 (Membership Agreement). Mr. Van Patten's contract was a pre-printed form widely used

at all Gold's Gyms at the time. *See* ER 8 (Berggren Depo. at 44:24-45:17; 58:17-59:4).

Ms. Berggren, not Mr. Van Patten, filled out the contact information on the form Membership Agreement and put down Mr. Van Patten's phone number in the space designated for "primary phone number," although Mr. Van Patten did supply that number. *See* ER 8 (Berggren Depo. at 86:7-10, Advecor's Motion for Summary Judgment ("MSJ") at 3:4-11, (District Ct. Doc. No. 55) ("Plaintiff's 'contact' phone number was taken from the prequalification card he filled out."). Mr. Van Patten was required to supply his number for inclusion on the agreement. *See* ER 4 (Membership Agreement); ER 8 (Berggren Depo. at 48:23-49:17). The agreement was for a particular type of gym membership plan (a "FIT" gym membership) and a particular Gold's Gym located at 790 Hansen Rd., Green Bay, WI 54304. *See* ER 4 (Van Patten Membership Agreement).

At no point did anyone ever ask Mr. Van Patten if he had any limits on how his phone number could be used. ER 8 (Berggren Depo. at 95:5-96:7). Nor did anyone ever give Plaintiff the option to opt-out of telephone or texting contact. *See id.* at 69:12-20. In fact, per typical practice, these options were never offered. *See id.* at 69:12-20; 56:22-57:13; 58:9-59:4 (common training re member sign-ups that is the same today); 69:12-20;

9

84:15-85:11 (describing Ms. Berggren's "invariable process"). Text messages were simply never discussed. *Id.* at 69:12-20.

Mr. Van Patten's Gold's Gym "membership" was very short lived. He was a member for no more than three days. ER 9 (Vert. Fitness Depo. at 129:5-12). Mr. Van Patten affirmatively cancelled his membership over the phone. *Id.* ER 12 at 129:5-12; *see* ER 4 (Membership Agreement, Terms of Cancellation).

Defendant Vertical Fitness promotes over a dozen "Xperience Fitness" gyms. ER 8 (Berggren Depo. at 17:2-18:19); ER 9 (Vert. Fitness Depo. at 30:11-31:21). Those gyms are each owned and operated by various non-parties to this suit. ER 9 (Vert. Fitness Depo. At 49:5-20). Many of the "Xperience Fitness" gyms were "Gold's Gym" franchises. *Id.* at 32:12-33:5. In Spring 2012, the non-party gym owners each terminated their Gold's Gym franchise agreements and "de-identified" with Gold's Gym as of May 1, 2012, including the owner of the Gold's Gym that Mr. Van Patten briefly signed up for, non-party Green Bay Fitness, LLC ("Green Bay"), who is wholly owned by Fox River Fitness, LLC ("Fox River"). *Id.* at 37:13-18; 39:21-40:2; 40:21-41:2; 49:17-20.[1] The non-party gym owners wanted to

---

[1] Gold's Gym, Vertical Fitness, Green Bay and/or Fox River are distinct and separate entities. *See* ER 9 (Vertical Fitness Depo. at 37:13-2) (Vertical Fitness states that the Green Bay gym was 100% owned by Fox River and

change their brand and de-identify with Gold's Gym realizing that some members or potential members did not like Gold's Gyms. *Id.* at 17:18-25. The owners wanted to create a different gym. They then created Xperience Fitness. *Id.* at 48:5-15.

When launching its new gyms, the non-party gym owners, including, Fox River, used Vertical Fitness to market the new "Xperience Fitness" gyms and to obtain new paying gym members. In turn, Vertical Fitness engaged marketing partner Advecor. ER 9 (Vert. Fitness Depo. at 7:15-8:23, 17:16-18:6, 39:21-40:21); ER 11 (Advecor Depo. at 24:13-26:16 (job was to "[p]rovide marketing services to obtain new members"); 15:14-24). Vertical Fitness hired Advecor to, among other things, send "text messaging blasts" to former members of the gyms. ER 11 (Advecor Depo. at 31:7-32:7, 33:18-34:5, 82:9-12); ER 16 (Advecor's Interrog. Responses at No. 1).

On May 14, 2012, long after Mr. Van Patten cancelled his Gold's Gym membership, Defendants blasted Mr. Van Patten and his fellow class members with its first marketing message promoting the new "Xperience

---

that they had no membership or ownership group in Fox River); *see* ER 4 (Membership Agreement) (Green Bay and/or Fox River is not mentioned anywhere in the membership agreement); Vertical Fitness' MSJ Oppo. at 15:14-15. (Vertical Fitness conceded that express consent was not provided to it, but instead to Green Bay).

Fitness" gyms and asking them to come sign up for Xperience Fitness gyms at a price of $9.99/month. *See* ER 7 (Van Patten Phone Screen Shot). On June 25, 2012, Defendants blasted consumers again with a second message.[2] *Id.* Neither message gave anyone an option to opt-out from receiving these promotional messages. *Id.* Mr. Van Patten never gave anyone express consent to send those text messages. ER 13 (Van Patten Decl. at ¶ 2). At no point did Mr. Van Patten ever execute a membership agreement with Vertical Fitness or Xperience Fitness. *See* ER 12 (Van Patten Depo. at 120:1-4); ER 4 (Membership Agreement).

## II.     Mr. Van Patten Files a Class Action Lawsuit Against Defendants

On July 25, 2013, Mr. Van Patten filed this class action against Defendants for violation of the TCPA, the California Business and

---

[2] Both texts said, essentially: *Gold's Gym is now Xperience Fitness. Come back today for $9.99 per month, no commitment and be entered for a chance to win a new Nissan Xterra. Visit myxperiencefitness.com/giveaway for details. See* ER 7 (Van Patten Phone Screen Shot); ER 9 (Vert. Fitness Depo. at 15:18-16:9, 195:11-197:10, 202:1-6). Advecor sent the former member text blast to the same 30,355 former Gold's Gym members, twice: once in May and once in June. ER 10 (Vert. Fitness Amended Interrog. Responses at No. 1). Defendant also sent similar messages to then-current members of Xperience Fitness gyms. At the time of responding to discovery Defendant could not determine how many then-current members were blasted in June, but during deposition Vertical fitness confirmed that it could "comfortably" say there were at least 50,000 current members at that time. *Id.*; ER 9 (Vert. Fitness Depo. at 195:11-199:12). Ultimately at issue in this case is Defendants' blasting out of over 110,000 text advertisements with a few computer key and mouse strokes.

Professions Code equivalent, and California's UCL stemming from the unsolicited test message advertisements sent to his cellular phone. ER 14 (First Amended Complaint). In August of 2013, Defendants filed their answers. On November 8, 2013, the District Court granted Mr. Van Patten's Motion for Class Certification—certifying a class and subclass that included at least 80,000 consumers. ER 17 (Class Cert. Order).

Mr. Van Patten and both Defendants filed cross-motions for summary judgment and the District Court found in favor of Defendants, granting their motions and denying Mr. Van Patten's on May 20, 2014, thereby eliminating the claims of over 80,000 consumers.

Mr. Van Patten had moved for summary judgment with respect to the TCPA cause of action, specifically concerning Defendants' affirmative defense that Mr. Van Patten gave Vertical Fitness "prior express consent" to be blasted with texts under the TCPA. Van Patten MSJ, (District Ct. Doc. No. 47). Defendants moved for summary judgment on all three of Plaintiff's causes of action. Vertical Fitness MSJ, (District Ct. Doc. No. 43); Advecor MSJ, (District Ct. Doc. No. 55).

In particular, Vertical Fitness moved for summary judgment on the TCPA cause of action based on the "prior express consent" defense, and that to the extent any violation of the TCPA occurred, Vertical Fitness could not

13

be held vicariously liable. Vertical Fitness MSJ at p. 1-3 (District Ct. Doc. No. 43). Advecor moved for summary judgment on the TCPA cause of action based on the "prior express consent" defense, and privilege under agency principles. Advecor MSJ at p. 14-20 (District Ct. Doc. No. 55).

Vertical Fitness moved for summary judgment as to Mr. Van Patten's second claim (Cal. Bus. & Prof. Code § 17538.41) arguing that the section only applies to an entity conducting business in California. Vertical Fitness MSJ at p. 3. (District Ct. Doc. No. 43). Vertical Fitness also moved for summary judgment as to Mr. Van Patten's third claim (Cal. Bus. & Prof. Code § 17200) based on dismissal of his first and second causes of action and arguing that Van Patten did not suffer an "injury in fact" and had lost no money or property. *Id.* For the most part, Advecor's motion for summary judgment as to the second and third causes of action was the same. Advecor MSJ at p. 22-25 (District Ct. Doc. No. 55).

## III.    The District Court's Ruling

The District Court improperly found in favor of Defendants. First, as to Mr. Van Patten's TCPA claim, the District Court found that because Mr. Van Patten gave his phone number to Gold's Gym when he became a member three years prior, that he consented to text ads by Defendants. ER 2 (Order at 17:6-9).

Second, as to Mr. Van Patten's claim under section 17538.41 of the California Business and Professions Code, the District Court found that, as a matter of law, Vertical Fitness does not conduct business in California in a manner that exposes it to liability. *Id.* at 17:9-11.

Third, as to Mr. Van Patten's section 17200 of the California Business and Professions Code cause of action, the court found that Mr. Van Patten's claim failed because either his previous two claims fail or because he hasn't suffered an adequate "injury in fact." *Id.* ER 2 at 17:11-13.

The District Court, however, did not address the issue of vicarious liability.

Mr. Van Patten timely filed his notice of appeal.

## IV.     Pertinent Developments Following the District Court's Ruling

Since the District Court's Ruling, various orders and opinions concerning the TCPA, and particularly the topic of "prior express consent," have been issued, making the court's reliance on various FCC orders and case law further unsound. In particular, *Kolinek v. Walgreens Co.*, 13-CV-4806, 2014 WL 518174 (N.D. Ill. Feb. 10, 2014)—which the District Court expressly relied on—was vacated on July 7, 2014. Ultimately, the *Kolinek* court *reversed* its earlier decision that had found a plaintiff providing his cellular phone number to a Walgreens pharmacist when filling his

15

prescription was "prior express consent" to be robocalled at that number. *See Kolinek v. Walgreens Co.*, 13-CV-4806 2014, WL 3056813, at *4 (N.D. Ill. July 7, 2014).

On March 27, 2014, the FCC handed down *In re Group Me/Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, FCC Rcd. 14-33, 2014 WL 126074 (Mar. 27, 2014) ("GroupMe Order"), which further clarified the limits to "prior express consent." Specifically, "prior express consent" requires more than just provision of a phone number. In addition, on June 30, 2014, the FCC issued an opinion in response to the Second Circuit's request for an answer involving the issue of "prior express consent" under the TCPA, discussing "prior express consent" in the same manner. *See Letter to Ms. Catherine O'Hagan Wolfe*, No. 13-1362, 2014 WL 2959062, at *1 (F.C.C. June 30, 2014) ("O' Hagan Wolfe Letter").

## SUMMARY OF ARGUMENT

There are three separate and distinct reasons why this Court should reverse the District Court's order.

**First**, the District Court should have denied Defendants' motions for summary judgment as to the TCPA claim because Defendants failed to prove their defense of "prior express consent" sufficient to invite summary judgment. The District Court erroneously adopted an "automatic consent"

16

standard by finding that Mr. Van Patten's provision of his phone number in connection with an old "Gold's Gym" membership meant that he consented to receiving bulk text ads years later about a different gym and different type of membership. (A): The District Court failed to faithfully apply the plain language of the statute, which requires clear and unmistakable "express consent." (B): Even assuming we need to turn to FCC Orders in the first place, the District Court misinterpreted those FCC Orders as creating automatic express consent upon provision of a phone number, as opposed to consent, potentially, for only normal and expected business communications. (C): Recent FCC rulings and case law further support Mr. Van Patten's narrower interpretation of the "express consent" defense, and further illustrate the error in the District Court's more expansive and spam-friendly view. (D): the District Court's reliance on *Pinkard, Emanuel, Roberts, Murphy, Baird, Steinhoff* and *Anderson* is misplaced. Finally, (E): if "prior express consent" was given at all to anyone, it was *not* given to Defendants and was also cancelled when Mr. Van Patten cancelled his gym membership.

**Second**, the District Court should have denied Defendants' motions for summary judgment as to the California Business and Professions Code section 17538.41 claim because either Vertical Fitness does "conduct business" in California or Mr. Van Patten has, at a minimum, raised a

17

genuine issue of material fact based on Vertical Fitness's substantial contact with California consumers and within the state of California.

**Third**, the District Court should have denied Defendants' motions for summary judgment as to the UCL claim too. (A): Defendants' motions for summary judgment should have been denied as to the first two causes of action, thus leaving intact the derivative claims under section 17200. (B): Mr. Van Patten did indeed suffer an adequate "injury in fact" by showing that he had to pay for a text messaging plan and, also, because the unrefuted evidence shows that spam text blasting of this magnitude increases the price of texts across the board.

This Court should overturn the District Court's summary judgment order and remand for further proceedings.

## ARGUMENT

I. **The District Court Erred in Ruling that Mr. Van Patten Provided "Prior Express Consent" in Accordance with the TCPA Just By Providing His Phone Number, Years Ago, to Gold's Gym for Association with his Short-lived Gym Membership.**

Under the TCPA, "prior express consent" is a defense for which the texters—Defendants/Appellees here—bear the ultimate burden of persuasion. *Grant v. Capital Mgmt. Servs., L.P.*, 449 F.App'x 598, 600 n.1 (9th Cir. 2011). Defendants did not satisfy this ultimate burden.

18

First and foremost, the plain language of the TCPA makes clear that the requisite consent must be "express." Accordingly, the various FCC interpretations on which Defendants and the District Court rely on for guidance do not need to be consulted in defining the term. Even if turning to FCC interpretations was necessary, Defendants and the District Court misinterpreted or misapplied them. Moreover, the various cases cited by Defendants and the District Court in support of their position that simply providing a telephone number equates, automatically, to consent, also misinterpret the FCC's rulings and apply a meaning not found in the statute. Nevertheless, those cases are absolutely distinguishable from our case. Furthermore, recent cases, as well as recent FCC opinions, contradict Defendants' and the District Court's overbroad interpretation of "prior express consent." Lastly, even if we were to accept Defendants' and the District Court's overbroad definition, which Mr. Van Patten does not, Defendants would still be unable to establish "prior express consent" because any consent that was given was revoked upon Mr. Van Patten's and the class members' termination of the gym membership and by the simple fact that the purported consent was not given to *these* Defendants.

A.   We Do Not Need to Look Any Further than the Plain Language of the TCPA, which Shows that Mr. Van Patten Did Not Provide Prior Express Consent.

The parties dispute the correct interpretation of the term "prior express consent." But as in any dispute involving the meaning of a statutory term, a court must start by looking at the language itself. *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *Satterfield*, 569 F.3d at 951. Here, the TCPA's language is plain. The District Court improperly ignored this plain language, however, and relied on other broad, strained, and spam-friendly interpretations when no such exercise was necessary. Faithfully applying the plain language of the TCPA, Mr. Van Patten did not provide "prior express consent" to Vertical Fitness. Further still, it was error to find that there were no material issues regarding the consent defense.

The term "prior express consent" is not defined in the statute. *See* 47 U.S.C. § 227(a). Therefore, we must construe meaning by looking to the common usage of the words pursuant to basic rules of statutory construction. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994); *Human Life of Washington, Inc. v. Brunsickle*, 624 F.3d 990, 1021 (9th Cir. 2010); *Satterfield*, 569 F.3d at 955; *Lusskin v. Seminole Comedy, Inc.*, 12-CV-62173, 2013 WL 3147339, at *3 (S.D. Fla. 2013).This appellate court, using

this common usage approach, has drawn on Black's Dictionary and defined express consent under the TCPA as "[c]onsent that is clearly and unmistakably stated." *See Satterfield*, 569 F.3d at 955 (citing BLACK'S LAW DICTIONARY 323 (8th ed. 2004)). In fact, all major legal dictionaries define "express" or "express consent" similarly. BARRON'S LAW DICTIONARY 176, "EXPRESS" (3d ed. 1991) ("to make known explicitly and in declared terms. To set forth an actual agreement in words, written or spoken, which unambiguously signifies intent. As distinguished from "implied" the term is not left to implication or inference from conduct or circumstances."); BALLENTINE'S LAW DICTIONARY 441, "EXPRESS" (3d ed. 1969) ("Adjective: Stated, explicit, clear; declared; not left to implication.). Various courts, likewise, adopt this same plain meaning of "express consent" in discussing the "prior express consent" requirement under the TCPA. *See*, *e.g., Satterfield,* 569 F.3d at 953; *Lusskin* 2013 WL 3147339 at *3; *Connelly v. Hilton Grant Vacations Co., LLC*, 12-CV-599-JLS (KSC), 2012 WL 2129364, at*4 (S.D. Cal. June 11, 2012); *In re Jiffy Lube Intern., Inc., Text Spam Litig.*, 847 F.Supp.2d 1253, 1259 (S.D. Cal. 2012); *Thrasher-Lyon v. CCS Commercial, LLC*, 11-CV-04473, 2012 WL 5389722, at *2 (N.D. Ill. Nov. 2, 2012).

Here, Mr. Van Patten did not give "prior express consent." Mr. Van Patten did not "clearly" and "unmistakably" state that Vertical Fitness or anyone on Vertical Fitness' behalf could send him, in perpetuity, promotional (or any) text messages through an automated telephone dialing system ("ATDS") or even promotional texts messages in general. ER 8 at 69:12-15; 70:7-9. Mr. Van Patten never made any such expression—as the District Court correctly observed. *See* ER 2 at 5:14-17 . Instead, what Mr. Van Patten did was sign up, years before the texts, for a gym membership with an old Gold's Gym, at which time he gave his contact information as he was required to do as part of the sign-up process. *See* ER 12 (Van Patten Depo. at 124:13-22).

Here, the District Court reached beyond the statutory text and gave great deference to the FCC's 1992 Order. But Courts need only give deference to an agency's interpretation of a statute when the statute is unclear. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-843 (1984) The mere fact that a term like "prior express consent" "is not defined in a statute does not mean that the term is *per se* ambiguous." *Gardner v. Brown*, 5 F.3d 1456, 1459 (Fed. Cir. 1992). Here, the statute is *not* unclear. The statute clearly states that it shall be unlawful to make any call using any ATDS or an artificial or prerecorded voice unless made with

22

prior *express* consent. 47 U.S.C. § 227(b). The statute makes certain that consent must be *express*—rejecting any other forms of (implied) consent.

Arguably, an appropriate question to ask in assessing the scope of the TCPA's language is: "express consent *to what*?" Both sides of the debate naturally want to define that issue in ways that benefit them. The spammers want the scope to be defined broadly, e.g., that under the TCPA, giving up your phone number automatically equates to express consent to be (1) called *or texted* at that number, (2) by the person you gave the phone number to *or any potentially affiliated party*, (3) by *any* means (including automatic dialers that allow tens of thousands of calls to be sent in seconds), (4) for *any* reason, and (5) forever. But the annoyed consumers want the scope narrowed, e.g., that the required consent must actually rise to the level of "express consent" to be (1) texted (as opposed to called), (2) by a particular person or entity (if texting from an affiliate, this must be specifically disclosed and consented to)*,* (3) with *advertisements*, (4) using an automatic dialer, and (5) only for an expressly agreed-upon length of time (or if the potential time period is "forever," then that must also specifically be expressed and consented to). So which is the better view?

The better view is the consumer's view. The narrower view better respects the purpose and history behind the TCPA. The TCPA was enacted

in response to an increasing number of consumer complaints that the increasing number of telemarketing calls were a "nuisance and an invasion of privacy." *See Satterfield,* 569 F.3d at 954. Accordingly, "[t]he purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy." *Id.* More importantly, "[t]he TCPA's statutory and legislative history emphasize that the statute's purpose is to prevent unsolicited automated telemarketing and bulk communications." *Ibey v. Taco Bell Corp.*, 12-CV-0583-H (WVG), 2012 WL 2401972, at *3 (S.D. Cal. June 18, 2012).

The District Court erroneously adopted the spammers view—the broader view. The District Court blessed these Defendants' behavior, which included bulk text advertising using an ATDS, by, at *most*, an affiliate—something that it is undisputed was never even discussed among the parties to this suit, let alone expressly disclosed and expressly consented to. Defendants, with a few computer strokes, were able to send out bulk text advertisements to over 80,000 people in very short order and without much human intervention. Over 30,000 of those consumers were not even a member of the gyms that Defendants were now promoting. Defendants, moreover, sent their bulk ads without regard to legalities and without even

24

caring if consumers, for example, were on the state or national "Do Not Call" lists. ER 23, (Snyder Decl., ¶ 14). Defendants blasted the bulk texts without checking to see if they had any consent whatsoever. ER 9 (Vert. Fitness Depo. at 67:23-69:24, 78:18-21; 70:16-25 ("Q: So did you [Vertical Fitness] just assume it was legal? A. Yes"). And Defendants sent the bulk texts without giving anyone the right to opt out of future texts. ER 7 (phone screen shot).

This type of quick, bulk, and indiscriminate advertising that pays no mind to consumers' privacy interests is the *very thing* that the TCPA is intended to regulate and prevent. *See Satterfield*, 569 F.3d at 954. But it is exactly what these Defendants did. And it is what our District Court's broad interpretation allows. This might have been permissible had the gym member contracts specifically and expressly covered the things that Congress was trying to regulate and prevent (bulk calling, advertising, use of automatic dialers), but it is undisputed here that Defendants never even addressed those issues with these consumers. The Defendants' and the District Court's interpretation of "express consent" in this case was too broad and was inconsistent with the history and purpose behind the TCPA. The District Court's ruling that there was not even a material issue in this regard must be overruled.

B.      The District Court's Interpretation of Particular FCC Orders
        Was Flawed. Contrary to the District Court's Opinion, these
        FCC Orders Do Not Cut Against the Class.

As explained above, we do not need to get into the FCC Orders. But even if we did, the District Court's interpretation of the FCC's 1992 and 2008 Orders was incorrect. *Cf.* ER 2 (Court Order at 5:24-6:13).

Defendants and the District Court rely primarily on the following language standing alone in the FCC's 1992 Order: "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In re Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 (Oct. 16, 1992). Defendants and the District Court also took refuge in the FCC's 2008 Order which says: "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *In re Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559, 564 (Jan. 4, 2008). However, to the extent that the District Court and Defendants rely on the 2008 Order standing alone, it cannot support the finding that "prior express consent" was obtained by Mr. Van Patten as no creditor-debtor relationship was alleged or proven by the

26

Defendants. Simply put, no debt was alleged to have been created, and the text messages at issue did not concern collection on a debt or even collection on, say, a delinquent gym membership account.

Nevertheless, it is evident that adoption of such an overly broad reading of the 1992 Order alone or collectively with the 2008 Order conflicts with the true scope of "prior express consent" as contemplated by the Commission. Pursuant to the 1991 House Report for the bill that would become the TCPA, the phrase "with prior express consent" was meant to allow, at most, normal business communications. *See* H.R. REP. NO. 102-317, at 17 (1991). "The Committee does not intend for this restriction to be a barrier to the normal, expected or desired communications between businesses and their customers. For example, a retailer, insurer, banker or other creditor would not be prohibited from using an automatic dialer recorded message player to advise a customer . . . that an ordered product had arrived, a service was scheduled or performed, or a bill had not been paid." *Id.* Further interpretation of prior express consent in its 1992 Order was building upon this original purpose. *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 (citing H.R. REP. 102-317, at 13 (1991)). Hence, even under the FCC Orders, consent by merely providing a phone number equates to, at *most,*

27

consent to receive "normal, expected, or desired" business calls (communications between businesses and their customers)—*not* advertisements to non-customers, or pleas to have customers refer non-customers over to the business. *See* H.R. REP. 102-317, at 17 (1991); *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 (citing H.R. REP. 102-317, at 13 (1991)).

Here, the text messages at issue do not fall within the scope of normal business communications, and therefore, the 1992 Order is ultimately inapplicable. Defendants' text messages were not "normal, expected or desired communications between businesses and their customers" as Mr. Van Patten had no business relationship with Vertical Fitness, Xperience Fitness, and/or Advecor.[3] Even if the Court were to accept Gold's Gym tenuous relationship between Vertical Fitness and Advecor, the text messages were still not normal business communications. Here, Defendants were not contacting Mr. Van Patten to communicate that his gym bill was outstanding or that he left his keys at the gym—communications that would certainly be normal, expected, and desired by a current gym member, and

---

[3] At no point did Mr. Van Patten ever execute a membership agreement with Vertical Fitness or Xperience Fitness. *See* ER 12 (Van Patten Depo. at 120:1-4); ER 4 (Membership Agreement). Also, at no point did Mr. Van Patten ever engage with Advecor in such a way that he would be considered its customer.

which fall in line with the Committee's examples of "normal" or "expected" communications. Defendants' text messages are different. These text messages involve advertisements for an entirely different gym—communications that would certainly not be normal business communications between a gym and its current gym member—especially considering that the membership agreement only pertained to payment of that then-existing membership and general rules concerning use of the facilities. *See* ER 4 (Membership Agreement).

Importantly, the text messages complained of here were the first of their kind. *See* ER 16 (Advecor's Interrog. Responses at No. 14). None of the consumers here (neither the former gym members nor then-current members) had ever received any *other* advertisements from Defendants. Advertisements, and, in particular, auto-dialed text advertisements, were not "normal." Defendants, despite it being their burden to carry the day on a motion for summary judgment, introduced no evidence to the contrary. Nor did Defendants introduce any evidence to suggest that these kinds of text ads would have been "expected," or "desired," particularly for those 30,000+ consumers, like Mr. Van Patten, who had cancelled their "Gold's Gym" membership years prior and probably never heard of "Xperience Fitness"

29

before.[4] At a minimum, whether the first-time bulk text advertising of "Xperience Fitness" gyms were "normal" business communications should have been viewed as a dispute or question of fact, unsuitable for determination on a motion for summary judgment. The District Court erred in holding otherwise.

Moreover, such an expansive reading of the 1992 Order alone or collectively with the 2008 Order would be in contravention to the principal purpose and spirit of the TCPA,[5] and unreasonable. It would seem illogical that anytime, in the case where a consumer provides a phone number to a business, he or she is giving permission *in perpetuity* to be contacted by an automatic dialer *regarding anything under the sun*. Such an expansive interpretation would lead to endless spam text messages, as there would be no limits in terms of subject matter, number of texts, or for how long one-time gym members, like Mr. Van Patten, can expect to be blasted with texts—especially considering that these text messages never included an "opt out" or "STOP" option. *See* ER 7 (Van Patten Phone Screen Shot).

---

[4] Another way to look at it is: how could an advertisement about "Xperience Fitness" gyms have been expected when, for at least 30,000 consumers, that gym or its membership plans did not *exist* at the time the consumers handed over their phone numbers to Gold's Gym?

[5] "The TCPA is a remedial statute that was passed to protect consumers from unwanted automated telephone calls . . . Because the TCPA is a remedial statute, it should be construed to benefit consumers." *Gager v. Dell Fin. Servs., LLC,* 727 F.3d 265, 271 (3d. Cir. 2013).

Furthermore, the 1992 Order uses the term "knowingly," as in the consumer must "knowingly" consent. It would be far-fetched to suggest that Mr. Van Patten, by providing his phone number in connection with a gym membership to Gold's Gym, knew he was giving permission to receive promotional text messages or calls through an ATDS by Defendants—let alone promotional or sales text unrelated to any business Mr. Van Patten had with either Defendants or Gold's Gym—considering that neither he nor his fellow consumers were ever informed or given any slight indication that this would even be a possibility. As the District Court correctly confirmed in its Order, there was no reference or discussion concerning text messages—let alone text messages sent via an ATDS—at any point leading up to, during, or following Mr. Van Patten providing his phone number. *See* Order at 5:14-21.[6]

---

[6] The District Court stated, "[t]here is no dispute here that Van Patten never actually said to Vertical Fitness, 'Yes, you may text me at the number I have given you,' or anything like that. He never signed his name or initialed next to a disclaimer that by providing his phone number to Vertical Fitness he was welcoming text messages. As the Court said above, when Van Patten joined the Gold's Gym, the subject of text messages never came up. Van Patten simply provided his phone number on an application card with no discussion of why gold's Gym needed it or what they would do with it." ER 2 (Order at 5:14-21).

C.  Recent FCC Rulings Further Support the Consumer View as Opposed to the broad Spammer View regarding "Prior Express Consent' and, thus, that the District Court's Interpretation of the FCC Orders was Incorrect.

Since the briefing of the parties' motions for summary judgment and the District Court's Order, recent rulings and opinions issued by the FCC and the Courts have shed further light on the topic of "prior express consent." In short, they further demonstrate that the District Court's interpretation of the TCPA is incorrect.

First, on March 27, 2014, the FCC issued a ruling in *In re Group Me/Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, FCC Rcd. 14-33, 2014 WL 126074 (Mar. 27, 2014) ("GroupMe Order"). Petitioner GroupMe, a provider of free group text messaging service, asked the Commission to clarify whether a consumer's prior express consent may be obtained through and conveyed by an intermediary. *Id.* at *1, 2. In addressing this question, the GroupMe Order was particularly illuminating on the subject of "prior express consent," specifically that "prior express consent" under the TCPA (consistent with FCC's 1992 Order and 2008 Order) is limited in scope and that the scope must be determined by the facts of each situation. *Id.* at *4.

The FCC said that in accordance with its 1992 and 2008 Orders, TCPA's "prior express consent" requirement is satisfied "[t]o the extent that a consumer, in the absence of instructions to the contrary, *agrees to participate* in a GroupMe group, *agrees to receive associated calls and texts*, **and** *provides his or her wireless telephone number* to the group organizer **_for that purpose_**." *Id.* The FCC further emphasized that this "prior express consent" is satisfied "with respect to both GroupMe and the group members regarding that particular group, *but only regarding that particular group*." *Id.* Hence, the GroupMe Order indicates that *only* providing a phone number would be insufficient to show blanket "prior express consent." In short, the FCC was rejecting a spammer-friendly "automatic consent" theory.

Second, on June 30, 2014, the FCC issued an opinion in response to the Second Circuit's request for an answer to the following question: whether a person provides "prior express consent" within the meaning of the TCPA to receive auto-dialed debt collection calls when he agrees to be called in connection with the termination of a deceased debtor's account even though he or she is not responsible for the debt and the consent to be called did not occur during the transaction that resulted in the debt owed. *Letter to Ms. Catherine O'Hagan Wolfe*, No. 13-1362, 2014 WL 2959062, at

33

*1(F.C.C. June 30, 2014) ("2014 Opinion"). Like the GroupMe Order, the 2014 Opinion also clarified that the TCPA's "prior express consent" requirement is limited in scope and that the scope must be determined by the facts of each situation. *See id.* at *2 ("[a]n individual's consent, once obtained, is not unlimited" and "the scope of consent is based upon the facts of each situation").

The underlying district court case, prompting the 2014 Opinion, involved the following facts: the plaintiff contacted a power company via telephone to request the discontinuance of electric service of his deceased mother-in-law; the plaintiff provided the power company with his cellular phone number during that call; a collection agency hired by the power company to collect an outstanding balance on the mother-in-law's account (defendant in the case) began calling the plaintiff's cellular phone using an automated dialing system about a year and a half later. *Id.* at *3. The defendant moved for summary judgment on the plaintiff's claims, including his TCPA cause of action, and the court granted the defendant's motion for summary judgment and dismissed the case. *Id.* at *4.

In granting the defendant's motion as to the TCPA cause of action, the court held, like our District Court did below, that the plaintiff's knowing release of his cellular phone number to the power company was express

consent to be called at that number—relying on the FCC's 1992 Order. *Id.* at *4, 5*; Nigro v. Mercantile Adjustment Bureau, LLC*, 2012 WL 951497, at *3, 4 (W.D.N.Y. March 12, 2013). An appeal to the Second circuit followed, as did the FCC's 2014 Opinion. The FCC opined that the district court's analysis was incorrect and that "[u]nder the TCPA and the FCC's implementing regulations, [the plaintiff's] provision of his cell phone number to [the power company] does not qualify as consent to receive autodialed or prerecorded debt collection calls to that number." *Catherine O'Hagan Wolfe*, 2014 WL 2959062 at *4. Instead, any presumable consent would be limited to calls regarding the termination of service to the mother-in-law's residence. *Id.* at *5 ("the mere fact that [the plaintiff] provided his number to [the power plant company] did not convey his consent to be called regarding that debt"). Hence, the FCC concluded that the Second Circuit should reverse the district court's ruling that the plaintiff's consent extended automatically to the defendant's debt collection calls. *Id.* at *6.

The takeaway is this: "prior express consent" under the TCPA is, consistent with the purposes and history behind the TCPA, limited in scope. The true scope, furthermore, must be decided in light of the surrounding facts and circumstances.

35

The District Court's adoption below of a broad automatic consent standard cannot be reconciled with these recent opinions. The District Court erred in failing to find a single factual dispute for the jury to contemplate. We see this, for example, in the District Court's determination that limited consent to Gold's Gym is broad consent to Vertical Fitness—that broad-sweeping consent was "transferred." (*Cf.* Order at 11:24-25.) Even if "transfer" of express consent were an appropriate and supported doctrine, such a finding inevitably required weighing of evidence (like the changing of the gyms' brand, name, and location) and the making of inferences in a light that was very favorable to Defendants, and not the Class (e.g. that despite outward appearances and a stated desire by the Defendants to be different than Gold's Gym, the gyms really are "the same.") It was inappropriate for the District Court to do these things and to give Defendants the benefit of the doubt on these summary judgment motions.

Furthermore, the February 10, 2014 *Kolinek* decision that the District Court relied upon in supporting its reading of the relevant TCPA orders[7] was vacated on July 7, 2014. *Kolinek*, 2014 WL 3056813 at *1. The *Kolinek* Court had previously read the FCC's 1992 Order as, in effect, establishing a general rule that when a consumer provides his or her cellular telephone

---

[7] *See* ER 2 (Court Order at 8:14-21).

36

number to a business for any reason, the consumer consents to receive calls from that business for whatever purpose. *Kolinek*, 2014 WL 518174 at *2 (vacated by *Kolinek*, 2014 WL 3056813 at *1). However, the *Kolinek* court later, and correctly, concluded that it had erred, reasoning that "[t]he 2014 GroupMe Order, and the 2008 and 2012 Orders when read in light of the 2014 Order, make it apparent that the FCC has established no such general rule." *Kolinek*, 2014 WL 3056813 at *2. "Rather, to the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on its context and the purpose for which it is given." *Id.* In accordance, "[c]onsent for one purpose does not equate to consent for all purposes." *Id.* Furthermore, the court correctly found that such a general rule would amount to *implied* (or automatic) consent—not express as required under the TCPA. *Id.*

Based on the foregoing, "prior express consent" and its scope are again properly determined by evaluating the surrounding facts of the case. Here, the circumstances in which Mr. Van Patten received the text messages at issue—first-time advertisements, from a new gym, via bulk transmittal, after the business relationship with the old gym ended, and not in connection with the transaction for which the number was provided—show that these text ads were not expressly consented to by Mr. Van Patten or his peers. The

37

only consent that *might* be presumed is that Mr. Van Patten consented to being contacted by Gold's Gym concerning his "FIT" gym membership at the Gold's Gym located at 790 Hansen Rd., Green Bay, WI 54304 as described in his Gold's Gym membership agreement over three years earlier—nothing more. *See* ER 4 (Van Patten Membership). At the very least, the District Court erred in failing to find a single triable issue on the subject for the jury to consider.

D.     The District Court's Reliance on *Pinkard, Emanuel, Roberts, Murphy, Baird, Steinhoff and Andersen* are Misplaced and, in any Event, those Cases are Distinguishable.

The District Court erroneously adopted a misinterpretation of "prior express consent," in part, by finding shelter in a handful of cases from other districts that are either themselves decided wrongly, or, at a minimum, are distinguishable from our case. ER 2 (Order at 6:18-9:9). *See, e.g., Pinkard v. Wal-Mart Stores, Inc.*, 3:12-CV-002902-CLS, 2012 WL 5511039, at *5 (N.D. Ala. Nov. 9, 2012); *Emanuel v. Los Angeles Lakers, Inc.*, 12-CV-9936-GW(SHx), 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013); *Roberts v. Pay Pal, Inc.*, 12-CV0622 PJH, 2013 WL 2384242 (N.D. Cal. May 30, 2013); *Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013; *Baird v. Sabre Inc.*, 2014 WL 320205 (C.D. Cal. Jan. 28, 2014); *Steinhoff v. Star Media Co., LLC*, 2014 WL 1207804 (D. Minn. Mar,

38

24, 2014); and *Andersen v. Harris & Harris*, 2014 WL 1600575 (E.D. Wisc. Apr. 21, 2014).

First, the *Pinkard* Court's holding that the mere provision of a phone number constitutes "prior express consent" is erroneous because the Court relied exclusively on an incorrect reading of the 1992 Order—that whenever an individual divulges his or her phone number, they are providing broad "prior express consent." *See Pinkard*, 2012 WL 5511039 at *5. The *Pinkard* court failed to consider the context and source of the 1992 Order and instead took a single statement in isolation to assert an over-expansive interpretation that mere provision of a phone number is "prior express consent"—not limited by normal business communications as envisioned by the Commission and thereby without any relative scope. *See id.*; *1992 Order*, 7 F.C.C.R. at 8769 (citing H.R. REP. 102-317, at 13 (1991)).

Nonetheless, *Pinkard* is distinguishable. In *Pinkard*, after the plaintiff provided her phone number to Wal-Mart when dropping off a prescription to be filled by their pharmacy, she received text messages from Wal-Mart. *Pinkard*, 2012 WL 5511039 at *2. In contrast to the facts here, the plaintiff in *Pinkard* received the text messages at issue within hours of dropping of her prescription, before it had even been filled and presumably paid for. *Id.* Also, the party to who plaintiff gave the number was also the sender of the

39

text messages. *Id.* More importantly there was a discussion concerning what the phone number would be needed for. *Id.* (the Wal-Mart employee expressly disclosed that the plaintiff's phone number might be used "in case there were any questions that came up [regarding *that* prescription]"). In short, the *Pinkard* texts were sent by the same business that had asked for the phone number (not some third party promoter like we have in this case), and the texts were sent within hours of the consumer engaging in business with the texter, when that business was not yet concluded (i.e. the prescription was still being filled), and when the texter had explicitly said that they might have to get a hold of the consumer about the prescription. The texts, thus, were likely related to the normal business the two parties were conducted and could have been expected.[8]

Second, *Emanuel* relies on *Pinkard*'s misreading of the 1992 Order and should be similarly discounted. *See Emanuel*, 2013 WL 1719035 at *3.

---

[8] We say here that the texts were "likely' related to the normal business of the prescription, and the texts "could" have been expected. But the reality is that the *Pinkard* court dismissed the Plaintiff's case without knowing what the texts said. *Pinkard,* 2012 WL 5511039 at *2. Respectfully, that is not the approach that this Court should take because the TCPA arguably requires us to examine what consent was "expressed" and what was not, and to examine what might be "normal," "desired," or "expected" business communications. It is difficult to fully examine those issues when you do not even know what the texts say. Here, in contrast, we know that Mr. Van Patten's texts came years after he had severed all business with Gold's Gym, and we know that the texts were auto-dialed bulk advertisements, and auto-dialed bulk advertisements for Xperience Fitness gyms, not Gold's Gyms.

Nevertheless, Emanuel is also distinguishable as it deals narrowly with the issue of instant confirmatory texts, which is not in controversy here. Also, in *Emanuel*, the plaintiff sent a text message *first* to the Los Angeles Lakers for the purpose of having them put a personal message on the scoreboard and shortly thereafter received an automatic confirmatory text message concerning his request (the one he later complained about). *Id.* at *1. Simply put, when you text someone, you might expect or even desire a text back. Mr. Van Patten, in contrast, never sent an initial text message requesting anything from Defendants that would initiate any sort of dialogue related to the Defendants' text messages. Never before had the Defendants/Appellees used texts with their consumers, let alone texts to advertise. Defendants here sent text messages out of the blue; several years after Mr. Van Patten cancelled his membership at a different gym. *See* ER 9 (Vert. Fitness Depo. at 129:5-12); ER 4 (Van Patten Membership Agreement).

Third, *Roberts* is another case that relied on *Pinkard's* misreading of the 1992 FCC Ruling.[9] *Roberts*, 2013 WL 2384242, at *3. Notwithstanding, *Roberts* is distinguishable from this case. There, the plaintiff provided his phone number to defendant, PayPal, Inc., specifically to receive information

---

[9] *Roberts* is also currently up on appeal and being considered by this Court. *Roberts v. PayPal, Inc.*, 13-16304 (9th Cir.) (case is fully briefed and awaiting oral argument).

regarding defendant's mobile services. The plaintiff then received just that: a text message regarding mobile services. *Id.* at *4. Also, unlike this case, in *Roberts* the plaintiff immediately received a text message upon providing his phone number on defendant's website. *Id.* at *1-2. Moreover, at the time plaintiff received the text message (from the defendant itself, moreover, and not a third-party promoter he had never heard of), he held an active PayPal account and had recently accessed his account—unlike Mr. Van Patten who had cancelled his membership and had not been an active member of the gym for over 3 years. *See id.* at *1.

More importantly, the terms of the user agreement in *Roberts* expressly said that: "[b]y providing PayPal a telephone number (including a wireless/cellular telephone), you consent to receiving autodialed and prerecorded message calls from PayPal at that number." *Id.* PayPal, in other words, expressly referenced some of the things that Congress meant to regulate in enacting the TCPA. Mr. Van Patten's membership agreement contained no such language or even remotely suggested that Mr. Van Patten would be receiving texts, let alone *autodialed* texts from a machine, let alone autodialed texts from a machine *that were advertisements*, let alone autodialed texts from a machine that were advertisements *for a gym he had*

*never been a member of and was at different location from the Gold's Gym he gave his number to years prior*. *See* ER 4 (Membership Agreement).

Fourth, *Murphy*, incorrectly relying on *Pinkard*, *Emanuel*, and *Roberts* is also distinguishable. *See Murphy*, 2013 WL 6865772 at *8. In *Murphy*, the plaintiff received a text message from the defendant (the same entity that the plaintiff provided his phone number to) in connection to his paid blood donations to the defendant—occurring on several occasions. *Id.* at *2. Here, no similar business relationship existed; repeated transactions of the same nature did not occur; and the text message was sent by Defendants, wholly separate companies from Gold's Gym, the company that Mr. Van Patten told his phone number to.[10]

*Baird* is unhelpful too. *Baird* is also part of the *Pinkard* family, having relied on *Pinkard*, *Emanuel,* and *Roberts. Baird*, 2014 WL 320205 at *2. *Baird* is also distinguishable. In *Baird*, the plaintiff received a text message concerning flight notifications three weeks after making her reservation, and about a month before her scheduled departure (i.e while the reservation was still active), after entering her phone number in the "Contact Information" box when booking flights online on the defendant's website. *Id.* at *1. The plaintiff was also offered an option to not receive any further texts. *Id.* (the

---

[10] Also, the plaintiff there never cancelled his donor-ship as Mr. Van Patten and his fellow plaintiffs had cancelled their memberships. *Id.* at *1-3.

text message invited the plaintiff to reply "yes" to receive flight notification services; the plaintiff did not respond; and Defendant sent her no more messages).[11] Mr. Van Patten, however, received the text messages complained of years after the phone number was obtained and not in connection with the original transaction from which the number was obtained. Mr. Van Patten was also never offered an opportunity to stop receiving text messages from Defendants.

Sixth, *Steinhoff*, also part of the *Pinkard* family, is also distinguishable. *See Steinhoff*, 2014 WL 1207804 at *3. In *Steinhoff*, there was an alleged creditor-debtor relationship, there was a debt, the plaintiff affirmatively asked to be called back at their cellular phone number, and the plaintiff provided the defendant with his phone number. *Id.* at *1. By contrast, in Mr. Van Patten's case, there was no creditor-debtor relationship (or *any* relationship at all at the time of the texts), there was no debt, Mr.

---

[11] Although not addressed by the Court, the *Baird* defendant made available through a link on its website, a privacy policy informing users that any personal information might be shared with the defendant's vendors and contractors. *Baird*, 2014 WL 320205 *1. No equivalent notice or disclosure was ever made to Mr. Van Patten or his fellow class members concerning the use of personal information.

Van Patten never asked to be called back (let alone with auto-dialed bulk texts), and he never provided his phone number to these Defendants.[12]

The District Court should not have relied on these cases so heavily. The cases above either adopted an erroneous definition of "prior express consent;" failed to properly evaluate the facts of their cases in conjunction with the 1992 Order's use of the phrase "prior express consent;" or are simply inapplicable on their facts. The District Court's Order and judgment in Defendants' favor must be overturned.

> E.      Even if Mr. Van Patten Gave Defendants "Prior Express Consent," Which He Did Not, the Consent Was Given to Gold's Gym and Was Also Revoked Upon Mr. Van Patten's Cancellation of His Gym Membership.

First, even if providing required phone numbers on membership agreements was sufficient to signify any "express consent," such "consent" was given to Gold's Gym and not Xperience Fitness or Vertical—let alone Advecor. Mr. Van Patten joined the gym when it was still part of the long-standing and well-known Gold's Gym family. *See* ER 8 (Berggren Depo. at

---

[12] *Andersen* is distinguishable for similar reasons. In *Andersen*, there was an alleged creditor-debtor relationship, there was a debt, the plaintiff asked to be called back at their cellular phone number, and the plaintiff provided his phone number to the defendant. *Andersen*, 2014 WL 1600575 at *3. However, Mr. Van Patten was not a debtor, there was no creditor-debtor relationship, there was no debt, he never asked to be called back, and he never told his phone number to Defendants.

60:5-16) (the membership application bore the name Gold's Gym); ER 9 (Vert. Fitness Depo. at 17:16-18:6; 39:21-40:21; 46:6-17); ER 4 (Membership Agreement). Only "Gold's Gym" appeared on Mr. Van Patten's membership agreement. *See* ER 4 (Membership Agreement). Mr. Van Patten applied for a particular gym at a particular address. *Id.* And Mr. Van Patten applied for only a particular kind of gym membership. *Id.* (the "FIT" membership structure).

At the time Defendants blasted all of the gym's *former* members like Mr. Van Patten, the gym was no longer part of the storied and respected Gold's Gym family and severed any such association. *See* ER 9 (Vert. Fitness Depo. at 17:16-18:6; 39:21-40:21; 46:6-17). Mr. Van Patten, therefore, never could have consented to auto-dialed text messages *from Xperience Fitness or Vertical Fitness* when signing up for his gym membership in 2009.

Nonetheless, the District Court curiously found that Xperience Fitness was simply a different brand name on the same gym with the very same ownership—making any consent given to the gym when it was a Gold's Gym "transfer" to Xperience Fitness. ER 2 (Order at 11:23-12:15). Mr. Van Patten disagrees. As a matter of fact, Gold's Gym, Xperience Fitness, Vertical Fitness, and Green Bay and/or Fox River are distinct and separate

entities. ER 9 (Vert. Fitness Depo. at 37:13-21) (Vertical Fitness stating that Green Bay was 100% owned by Fox River, and that Vertical Fitness had no membership or ownership group in Fox River). *See* ER 9 (Vert. Fitness Depo. at 37:13-21). In Spring 2012, non-party gym owners each terminated their Gold's Gym franchise agreements and "de-identified" with Gold's Gym as of May 1, 2012. The non-party gym owners wanted to change their brand and de-identify with Gold's Gym realizing that some members or potential members did not like Gold's Gyms. *Id.* at 17:18-25. In short, the Defendants themselves wanted *to be* a different gym and wanted everyone to *think* they were a different gym. ER 21 (Gold Gym Franchising LLC, Legacy II Franchise Agreement.)

It was this very *difference*, in Defendants' view, that created value. Yet the District Court never credited those facts. Nor did the District Court account for the fact that Mr. Van Patten's gym location had actually shut down or moved. ER 4 (Van Patten membership agreement shows the gym address); ER 18 (Screen shots of Xperience Fitness website no longer includes Mr. Van Patten's location) ER 19 (Xperience Gym Membership Agreement).

In short, there were more than mere material issues of fact for a jury to contemplate when it came to deciding whether the gyms were the same,

such that, in the District Court's words, express consent could presumably be "transferred." The District Court's factual finding that Xperience Fitness, Gold's Gym, and the various non-party entities that actually owned the gyms and collected the consumer contact information over time, are all "the same" is a finding that could only have been made after weighing evidence, discounting Plaintiffs' contrary evidence, and drawing all inferences in *Defendants'* favor. The District Court did the opposite of what it was supposed to do on a summary judgment motion.[13] Stated differently, to the extent "Xperience Fitness," "Vertical Fitness," and "Gold's Gym" being the "same" is an important factor, the District Court erred in failing to find a single dispute of fact on this issue.

Second, even if providing phone numbers on a membership agreement was sufficient to stand for "prior express consent," and even if providing consent to Gold's Gym was transferable to Vertical Fitness, any purported consent ended, at least with respect to the "former" Gold's Gym members, whenever those former members terminated their memberships. In

---

[13] Also, while the gym Mr. Van Patten joined may have continued to be owned by Green Bay and/or Fox River; Green Bay and/or Fox River is *not* mentioned anywhere in the Gold's Gym membership agreement that Van Patten signed. *See* ER 4 (Membership Agreement). Vertical Fitness conceded, furthermore, that express consent was not provided to *it*, but instead to Green Bay at the most (*see* Vertical Fitness' MSJ Oppo. at 15:14-15).

concluding that the TCPA does not treat the term "consent" different from its common law understanding, the Third Circuit has held that the TCPA allows consumers to revoke their prior consent. *See Gager*, 727 F.3d at 270. "[C]onsent is terminated when the actor knows or had reason to know that the other is no longer willing for him to continue the particular conduct." *Id.* "This unwillingness may be manifested to the actor by *any* words or *conduct* inconsistent with continued consent . . . ." *Beal v. Wyndham Vacation Resorts, Inc.*, 12-CV-271-BBC, 2013 WL 3870282 at *5 (W.D. Wis. June 20, 2013).

Here, Mr. Van Patten affirmatively cancelled his gym membership years before Defendants blasted him with promotional texts and never contacted them again. In doing so, Mr. Van Patten revoked any would-be consent. By cancelling his membership, Mr. Van Patten *did* show through his *conduct* that the relationship ended and any consent provided by entering the membership agreement was no longer appropriate.

The District Court, though, cited *Steinhoff* and *Andersen* to demonstrate that cancelling a gym membership is insufficient to constitute revocation. However, *Steinhoff* and *Andersen* are distinguishable and do not involve conduct clearly inconsistent with ongoing consent. For instance, in *Steinhoff*, the court found that letting a newspaper subscription naturally

49

expire did not constitute an "affirmative act of revocation." *Steinhoff*, 2014 WL 1207804 at *4. In contrast, cancelling or terminating a membership (by one party or the other) involves action.

In *Andersen*, the court found that a plaintiff's voice mail recording revoking consent and asserting his rights under the TCPA was not sufficient for revocation under the TCPA. *Andersen*, 2014 WL 1600575 at *10.[14] In coming to their conclusion, the Court reasoned that the debt collector would be extremely unlikely to actually receive notice of revocation by virtue of having used an automatic dialer. *Id*. Here, however, the evidence is that Defendants did actually receive Van Patten's cancellation. To summarize, even if it can be said that Mr. Van Patten or his fellow class members consented to anything, that consent was given to various third parties and *not* these defendants and, at least for the 30,000+ former gym members, that consent (whatever it was for) was revoked when their memberships were terminated. Again, the District Court's Order must be overruled.

---

[14] In *Andersen*, the defendant debt collector never received the plaintiff's message due to the use of automatic dialers and the plaintiff never demonstrated any other efforts on his behalf to revoke consent. *Id.* at *10-11.

**II.**     **The District Court also Erred in Ruling that There Was No Material Issue Regarding Whether Vertical Fitness "Conducts Business" in California.**

Section 17538.41 of the California Business & Professions Code is the state equivalent to the TCPA. It is violated when an entity conducting business in California transmits a text message advertisement to a cellular phone. Cal. Bus. & Prof. Code § 17538.41(a). Vertical Fitness contends that because the undisputed facts demonstrate that it doesn't conduct business in California, section 17539.41 is inapplicable. *See* Vertical Fitness MSJ at 18-19 (District Ct. Doc. No. 43). The District Court agreed. ER 2 (Order at 14:8-9). However, there are, at a minimum, genuine issues of material fact concerning whether Vertical Fitness conducts business in California. *See* Van Patten Oppo. to Vertical Fitness MSJ at 19-22.

For example, Vertical Fitness marketed its gym to Mr. Van Patten, a California resident; and *knowingly* sent hundreds of text message advertisements to 175 individuals with California addresses and/or California phone numbers[15]; provided access to their services in California;

---

[15] Without citing any evidence, the District Court said that many of those recipients of the text messages, who had California phone numbers, may be Wisconsin or Minnesota residents. *See* ER 2 (Order at 14:17-21). But that was speculation. The only *evidence* (the California phone numbers

engaged/contracted repeatedly with a California corporation, Advecor, to send their text message advertisements[16]; and stated in a press release that it plans to own and operate health clubs on a national basis. *See* ER 20 (Gym Member Data Produced by Advecor); ER 12 (Van Patten Depo. at 11:17-23); ER 22 (Email Chain Regarding Text Blast); ER 9 (Vert. Fitness Depo. at 8:7-23); ER 6 (Vert. Fitness Press Release).

However, the District Court improperly made the determination that Vertical Fitness does not conduct business in California as a matter of law. Again, summary judgment is improper "[i]f conflicting inference may be drawn from the facts." *LaLonde*, 204 F.3d at 959. The District Court may not make credibility determinations or weigh conflicting evidence. *Anderson*, 477 U.S. at 255. Thus, the District Court erred in holding there was no genuine and disputed issue of material fact as to whether Vertical Fitness conducts business in California.

---

themselves) suggests exactly the opposite. The District Court going so far shows that rather than viewing the evidence in a light most favorable *to Mr. Van Patten* and drawing all inferences *in Mr. Van Patten's favor*, the Court was erroneously giving Defendants the benefit of the doubt instead.

[16] The conclusion that the commercial relationship existing between Advecor and Vertical Fitness only serving a business interest in Wisconsin and Minnesota is equally conclusory and unsettled, demonstrating yet more genuine issues of material fact and, at a minimum, the District Court's erroneous drawing of inferences and interpretations from the evidence in *Defendants' favor*, instead of in Mr. Van Patten's favor. *See* ER 2 (Order at 14:25-27).

Moreover, the California Business and Professions Code does not define what it means to "conduct business" pursuant to section 17538.41 and thereby makes no limitations on the amount of business that needs to be conducted to satisfy a violation of that section. *See* Bus. & Prof. Code § 17538.41(a)(1). The District Court did not venture to articulate a standard. *See* Order at 13:16-15:9. However, under the California Revenue and Taxation Code, "conducting business" is defined as "actively exchanging in *any* transaction for the purpose of financial or pecuniary gain or profit." Cal. Rev. & Tax Code § 23101. Certainly Defendants' activities satisfied the "any transaction" standard.  The District Court never addressed that either.

**III.      The District Court Erred in Finding that Mr. Van Patten's UCL Cause of Action Fails.**

Lastly, the District Court found that Mr. Van Patten's UCL claim fails for either of the following two reasons: (1) Mr. Van Patten's previous two claims fail; or (2) Mr. Van Patten has not suffered an adequate "injury in fact."  ER 2 (Order at 15:10-17:4). However the District Court is wrong on both points.

First of all, a business act or practice is unlawful under the UCL if it violates any law or regulation. *People v. E.W.A.P., Inc.*, 106 Cal.App.3d 315, 319 (1980). Accordingly, a violation of an underlying law is a *per se*

violation of the UCL. *See Kasky v. Nike, Inc.*, 27 Cal.4th 939, 950 (2002). For the reasons discussed above, Defendants are not entitled to summary judgment in their favor for Mr. Van Patten's TCPA and Business & Professions Code section 17538.41 claims—thus leaving intact the derivative claims under section 17200. Therefore, Defendants' motions for summary judgment on the UCL claim cannot be granted under the unlawful prong.

Second, in order to have standing to bring a claim under the UCL, the person must have "suffered injury in fact" and "lost money or property as a result." Cal. Bus. & Prof. Code § 17204. Under the UCL, proof of "injury in fact" will often overlap with proof of "lost money or property." *See Kwikset Corp. v. Sup. Ct.*, 52 Cal.4th 310, 322-323, 325 (2011). Hence, where the plaintiff proves a loss of money or property, he or she necessarily proves injury in fact. *Id.* In *Kwikset*, the California Supreme Court noted that the UCL merely requires "economic injury" and that there are innumerable ways in which economic injury can be shown. *Id.* at 323.

Here, Mr. Van Patten suffered an economic injury when he was charged for the text messages sent by Defendants as part of his text-messaging plan. *See* ER 5 (Van Patten Phone Bills); ER 12 (Van Patten Depo. at 70:4-25). It is of no significance that Mr. Van Patten has an

54

unlimited text-messaging plan because he still pays for the text messages he receives on a monthly basis. *See id.* Mr. Van Patten still suffers an economic injury as a result of Defendants' conduct, despite having an unlimited texting plan. *See* ER 15 (Snyder Decl. at 4:7-5:12); *see also Smith v. Microsoft Corp.*, 11–CV–1958 JLS–BGS, 2012 WL 2975712, at *5 (S.D. Cal. July 20, 2012) (the TCPA similarly "does not limit protection to instances in which a plaintiff is charged individually, or even incrementally, for each text message").

Mr. Van Patten still incurs charges for every text messages he receives under an unlimited texting service because it ultimately affects his cellular telephone provider's bundled pricing plans. *See* ER 15 (Snyder Decl. at 5:1-12) ("Although there may not be a direct itemized fee associated for each individual telephone call or text message, the bundled fees charged to subscribers truly account for the itemized fees that may otherwise be individually charged. When telephone call and text message traffic increases to the point where a cellular operator's profit margins decrease for unlimited single-rate bundled pricing plans, the operator raises the price of these bundled plans, and offers alternative plans, to account for the loss in revenue. The revenue obtained by the cellular operators always originates with the cellular subscriber consumers and the fees they charge are always

55

based on the number of telephone calls and text messages subscribers send and receive, regardless of whether these fees are plainly discernable or not in an itemized list.").[17] It was error for the District Court to ignore this evidence. Mr. Van Patten, at a minimum has demonstrated a triable issue regarding his injuries.

## CONCLUSION AND SUMMARY OF REQUESTED RELIEF

Based on the forgoing, Mr. Van Patten, the class representative of over 80,000 consumers, respectfully requests that the Court overturn the District Court's order granting each of Defendants' Motions for Summary Judgment, and that this Honorable Court remand this case back to the District Court for further proceedings.

Dated: October 26, 2014    *s/ Alex Tomasevic*

NICHOLAS & TOMASEVIC, LLP

Dated: October 26, 2014    *s/ George Rikos*

LAW OFFICES
OF GEORGE RIKOS

Class Counsel and Attorney for
Plaintiff-Appellant

---

[17] Snyder also states in support: "It is my expert opinion, based on my knowledge, education, experience, expertise and training, that cellular telephone subscribers are always charged for the telephone calls and text messages they both send and receive, regardless of whether these charges are individually itemized or whether these charges are bundled into a single-price rate plan. ER 15 at 5:13-18. This was never refuted by Appellees.

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the attached Opening Brief by

**PLAINTIFF-APPELLANT BRADLEY VAN PATTEN** uses a

proportionately spaced Times New Roman type-face, 14-point, and the text

of the brief comprises 13,118 words according to the word count provided

by Microsoft Office Word 2010 word-processing software.


Dated: October 26, 2014         _s/ Alex Tomasevic_

                                NICHOLAS & TOMASEVIC, LLP

                                Class Counsel and Attorney for
                                Plaintiff-Appellant


Dated: October 26, 2014         _s/ George Rikos_

                                THE LAW OFFICES
                                OF GEORGE RIKOS

                                Class Counsel and Attorney for
                                Plaintiff-Appellant

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
9th Circuit Case Number: 14-55980

### ***CERTIFICATE OF SERVICE***

I, **Alex Tomasevic,** declare that I am over the age of 18 years and am not a party to the case; I am employed in the County of San Diego, California, where the mailing occurs; and my business address is Nicholas & Tomasevic, LLP, 225 Broadway, 19th Floor, San Diego, California 92101.

1. I hereby certify that on October 26, 2014, I electronically filed the following document: **PLAINTIFF-APPELLANT BRADLEY VAN PATTEN'S OPENING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

2. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2014**,** at San Diego, California.


S/ Alex Tomasevic

| **PARTIES AND ATTORNEY INFORMATION:** | |
|---|---|
| Mark E. Ellis<br>Andrew M. Steinheimer<br>Grant A. Winter<br>ELLIS LAW GROUP, LLP<br>740 University Avenue, Suite 100<br>Sacramento, CA 95825<br>T: (916) 283-8820<br>F: (916) 283-8821<br>Email:    mellis@ellislawgrp.com;<br>asteinheimer@ellislawgrp.com;<br>gwinter@ellislawgrp.com<br><br>**Attorneys for Vertical Fitness Group, LLC** | Gregory Garrison<br>Teeple Hall<br>9255 Towne Center Drive, Ste 500<br>San Diego, CA 92121<br>Phone: 858-622-7878<br>Fax: 858-622-0411<br>Email: greg@teeplehall.com<br><br><br>**Attorneys for Advecor** |

3